**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| ARNOLD'S OFFICE FURNITURE, LLC, *et al.,* | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil No. 5:20-cv-05470-JMG |
| | : | |
| IAN BORDEN, *et al.,* | : | |
| Defendants. | : | |

_____

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                    **June 6, 2023**

**I.      OVERVIEW**

Following a seven-day jury trial on Plaintiffs Arnold's Office Furniture, LLC,

("Arnold's") and Sunline USA LLC's ("Sunline") claims, a jury found that Defendant Ian

Borden committed breach of contract, breach of fiduciary duty, and misappropriated trade secrets

in violation of the Defend Trade Secrets Act ("DTSA") and the Pennsylvania Uniform Trade

Secrets Act ("PUTSA") by creating and operating a competing business, Defendant I M Borden

Group LLC ("IMBG").  As a result, the jury awarded Plaintiffs $1,057,016 in damages.

Defendants have filed a Motion for Renewed Judgment, or in the Alternative for a New Trial

pursuant to Rule 50(b), and a Motion for a New Trial pursuant to Rule 59.  Plaintiffs have filed a

Motion for Attorney Fees and a Motion to Extend Deadline for Filing of Motion for Attorney

Fees.  For the reasons set forth in greater detail below, Defendants' Motions and Plaintiffs'

Motion for Attorneys' Fees and Expenses are denied.  Plaintiffs' Motion to Extend Deadline is

granted.

## II.     BACKGROUND

Plaintiffs filed a Complaint with this Court on November 2, 2020, alleging misappropriation of trade secrets under the DTSA (Count I) and the PUTSA (Count II), breach of contract (Counts III–VI), and breach of fiduciary duty (Count VII).  *See* ECF No. 1.  On February 12, 2021, Plaintiffs filed an amended Complaint, *see* ECF No. 26, to which Defendants responded and brought counterclaims of their own, on February 26, 2021, *see* ECF No. 27.

The Court denied motions to dismiss filed by both parties, *see* ECF Nos. 13, 91, as well as the parties' cross-motions for summary judgment, *see* ECF No. 109.  On May 3, 2022, the Court notified the parties of its intent to bifurcate the trial.  *See* ECF No. 156.  Afterward, the Court held a seven-day jury trial on Plaintiffs' claims and Defendants' counterclaims.  *See* ECF Nos. 180, 192–197.  The jury found for Plaintiffs on all claims and counterclaims and awarded $1,057,016 in damages.  *See* ECF No. 179.  The jury further determined that Defendants' misappropriation of trade secrets was willful and malicious, and that Plaintiffs were entitled to punitive damages on their claim of breach of fiduciary duty of loyalty.  *See id.*  Following the trial, the parties have filed the instant motions, which will be addressed in an omnibus memorandum.

## III.    DEFENDANTS' MOTION FOR RENEWED JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

Defendants have moved for renewed judgment as a matter of law, or in the alternative, a new trial, on the basis that Sunline USA LLC ("Sunline") did not possess trade secrets to misappropriate, and, that Plaintiffs' customer lists, price lists and info kits were not entitled to trade secret protection.  Defendants also argue the jury's verdict on the trade secrets claims was against the weight of the evidence.

Under the Federal Rules of Civil Procedure, a party may make a motion for judgment as a matter of law before a case is submitted to the jury.  Fed. R. Civ. P. 50(a)(2).  "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b).  In ruling on the renewed motion, the Court may allow the verdict, order a new trial, or direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b)(1-3).

Such a motion should be granted only if, "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citing *Wittekamp v. Gulf & Western Inc.*, 991 F.2d 1137, 1141 (3d Cir.1993)).  "In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version."  *Id. (*citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 190 (3d Cir.1992), *cert. denied*, 507 U.S. 921 (1993)).  "Although judgment as a matter of law should be granted sparingly, [a court] will grant it where 'the record is critically deficient of the minimum quantum of evidence' in support of the verdict."  *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (quoting *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995)).

A Rule 50 motion also "may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  A district court may grant a new trial "for any reason for which a new trial has…been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A). This decision lies solely within the court's sound discretion.  *Pierce v. City of Philadelphia*, 811

F. App'x 142, 148 (3d Cir. 2020).  The district court's discretion is more limited, however, when the type of error alleged is that the jury's verdict is against the weight of the evidence. In such a situation, a new trial should be awarded "only when the record shows that the jury's verdict resulted in a miscarriage of justice or when the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991)*.*  The Third Circuit has observed that "[t]his limit upon the district court's power to grant a new trial seeks to ensure that a district court does not substitute its 'judgment of the facts and the credibility of witnesses for that of the jury.'" *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir.1992); *Hussein v. Universal Dev. Mgmt., Inc.*, No. 201CV2381, 2006 WL 8091008, at *3 (W.D. Pa. Jan. 3, 2006).

"Such an endeavor is not, however, lightly undertaken, because it necessarily 'effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts.'" *Guynup v. Lancaster Cty.*, No. 06-4315, 2009 WL 541533, at *1 (E.D. Pa. Mar. 3, 2009) (quoting *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir. 1960)).  While an error in law may be grounds for a new trial, "absent a showing of 'substantial' injustice or 'prejudicial' error, a new trial is not warranted" and the court should leave undisturbed a plausible jury verdict.  *Goodwin v. Seven-Up Bottling Co. of Philadelphia*, No. 96-2301, 1998 WL 438488, at *3 (E.D. Pa. July 31, 1998) (citation omitted).  "In determining whether to grant a new trial, a district court must 'view[ ] the evidence in the light most favorable to the non-movant and giv[e] it the advantage of every fair and reasonable inference.'" *Student Doe 1 v. Lower Merion Sch. Dist.*, No. CV 09-2095, 2010 WL 11558073, at *1 (E.D. Pa. Aug. 19, 2010) (quoting *Eddy v. V.I. Water & Power Auth.*, 369 F.3d 227, 230 (3d Cir. 2004) (quotation marks and citation omitted).

**A.  Sunline USA, LLC Trade Secrets.**

Defendants argue they are entitled to judgment as a matter of law, or in the alternative, a new trial because Sunline did not have any trade secrets to misappropriate.  In support of this argument they point to the testimony of Jordan Berkowitz, the president of Arnold's Furniture, who testified that Sunline does not possess trade secrets, proprietary information or lists of potential customers, and that these materials fall under the umbrella of Arnold's.  Partial Trial Tr. Day 2, 119: 12-20 (ECF No. 180).  In this testimony Jordan Berkowitz testified that "everything is insured, owned, paid, booked through Arnold's.  Sunline is just a company in name."  *Id.* at 119: 18-20.  Defendants contend there was no other evidence in the record to support a finding of liability on a PUTSA or DTSA claim, except for the testimony of Borden, who they claim was the only witness who testified that Sunline operated as a functioning company at the time of his employment.  Defendants argue it is unreasonable to assume the jury believed Borden on the issue of whether Sunline possessed trade secrets when the jury chose not to believe other parts of Borden's testimony.

Plaintiffs argue the evidence, in particular Borden's own testimony, was sufficient for the jury to conclude that Sunline possessed trade secrets.  They point to his testimony regarding pricing information for Sunline PPE and info kits for Sunline products.  *See* Trial Tr. Vol. 5, 41:21-25; *id.* at 190:16-24 (ECF No. 195).  They also cite his testimony regarding employment with and compensation from Sunline, and the different commission structures for Arnold's and Sunline.  *See id.* at 76:8-12; 55:6-12. They also cite the testimony of Meredith Street, the head of marketing for Plaintiffs, who testified as to the existence of the two companies. *See* Trial Tr. Vol. 3, 225:10-13; 238:22-23 (ECF No. 193).

With respect to Borden's testimony, when asked whether he had access to pricing information related to PPE products, he stated "Yeah, when Sunline Supply was formed you

know, there were different mask prices, and bootie prices, and gown prices, sure."  Trial Tr. Vol. 5, 41:21-25.  And when asked if he recognized an info kit put together by Arnold's Sunline, he stated "Correct."  *Id.* at 190: 22-24.  He also stated on several occasions that he was employed by Arnold's and Sunline.  For example, when asked if he was still employed by Arnold's in July 2021, he stated "And Sunline," *id.* at 168: 11-13, and when asked about a sale to United Medical Rehabilitation Hospital, Borden stated they purchased from him as both an Arnold's and Sunline employee.  *Id.* at 121: 5-11.  The jury therefore heard evidence from Borden as to his belief regarding Sunline trade secrets and his employment with both Sunline and Arnold's.

With respect to Jordan Berkowitz, in addition to the testimony cited above by Defendants, he also testified that Arnold's and Sunline were separate companies.  For example, when asked if Sunline had separate email addresses, he replied "Yes, of course.  We had a website and an email address.  It is a real company.  It is a brand.  We used an email.  We used a website.  We're not denying that.  But they don't have a contract with the company.  They get paid by Arnold's."  Partial Trial Tr., Day 2, 127: 2-7.  He also testified that salespeople were encouraged to use Sunline email addresses when selling PPE, *see id.* at 128: 10-13, and that Sunline was not owned by Arnold's.  *Id.* at 120: 8-10.

The record shows that evidence was presented from both sides regarding the two companies, Borden's conduct, and the existence of trade secrets.  As to Defendants' argument that it is unreasonable to assume the jury chose to believe Borden's testimony regarding Sunline's possession of trade secrets when they may not have believed other aspects of his testimony, the jury was instructed prior to deliberating, they could believe everything a witness said or only parts of it or none it.  *See* Trial Tr., Vol. 7, 86: 2-3.  Viewing the evidence in the light most favorable to the Plaintiffs a reasonable jury could believe Sunline possessed trade

secrets that were misappropriated.  Moreover, Defendants have failed to meet their burden of demonstrating "the jury's verdict resulted in a miscarriage of justice or shocks the conscience."

### B.  Customer Lists, Price Lists and Info Kits

Defendants next argue Plaintiffs failed to establish Defendants misappropriated any trade secrets.  With respect to the price lists and info kits, Defendants contend Plaintiffs presented evidence at trial that Defendants merely possessed these materials and did not actually use them. Defendants also argue the info kits lost trade secret protection when a number of them were posted to the Arnold's or Sunline's websites and distributed to customers.  As to the customer lists, Defendants argue they do not warrant trade secret protection because Plaintiffs produced no evidence that their customer lists represented "permanent and exclusive" relationships between themselves and their clients, and, they were obtained and curated using publicly available information.  Finally, with regard to the price lists Defendants argue they are not entitled to protection because they were comprised of information that is readily available.

Under the DTSA and PUTSA, a trade secret is information that: "(1) the owner has taken reasonable means to keep secret; (2) derives independent economic value, actual or potential, from being kept secret; (3) is not readily ascertainable by proper means; and (4) others who cannot readily access it would obtain economic value from its disclosure or use." *Jazz Pharm., Inc. v. Synchrony Grp., LLC*, 343 F. Supp. 3d 434, 444 (E.D. Pa. 2018).  "The crucial indicia for determining whether certain information constitutes a trade secret are 'substantial secrecy and competitive value to the owner.'" *Shepherd v. Pittsburgh Glass Works, LLC*, 25 A.3d 1233, 1244 (Pa. Super. 2011) (quoting *O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1070 (Pa. Super. 2003).  If such material has been publicly disclosed, it loses its trade secret status.  *Heartland Home Fin., Inc. v. Allied Home Mortg. Cap. Corp.,* 258 F. App'x 860, 862 (6th Cir. 2008).

1.  Acquisition And/Or Use of Trade Secrets

Defendants claim Plaintiffs failed to establish Defendants used the price lists and the info kits, only that Defendants merely possessed such materials.  Defendants argue "mere acquisition of a trade secret does not create liability unless the initial acquisition itself was improper – a claim not presented here."  Plaintiffs aver they have consistently maintained from the outset of this case that Borden improperly shared Plaintiffs' trade secrets with IMBG, and that IMBG's acquisition of the materials alone was improper.

Here the jury was presented with evidence as to the improper means under which the trade secrets were acquired.  Borden himself testified he received the company handbook, which contained a policy prohibiting the use of confidential information, which included trade secrets, for any personal benefit.  *See* Trial Tr., Vol. 5, 32:17-20, 35:3-46:14.  And as the jury was instructed prior to deliberating, the term "improper means" includes theft, misrepresentation, breach of a duty to maintain secrecy, or espionage through electronic or other means.  18 U.S.C. § 1839(6); *see also* 12 PA. STAT. AND CONS. STAT. ANN. § 5302; *see* Trial Tr. Vol. 7, 90:11-14.

Additionally, during the trial, the parties stipulated to several facts from which the jury could determine Defendants used these materials.  It was stipulated that prior to working for Plaintiffs, Borden had no knowledge of pricing on PPE, nor did he have any relationships with PPE vendors, that Borden used Plaintiffs' customer lists to send email blasts to potential customers from his Arnold's email address and then had the responses forwarded to his IMBG email address, and, that Borden used Plaintiffs' marketing materials to create marketing materials for IMBG.  *See* Trial Tr., Vol. 5, 26:2-18.  Viewing the evidence in the light most favorable to the Plaintiffs, Defendants have failed to establish there was insufficient evidence for a reasonable jury to find improper use and possession of trade secrets.  Moreover, Defendants

have failed to meet their burden of demonstrating "the jury's verdict resulted in a miscarriage of justice or shocks the conscience."

### 2. Info Kits

At trial Plaintiffs presented evidence the info kits consisted of a collection of information about specific products obtained directly from vendors.  The information contained in these kits often had to be translated into English.  Trial Tr. Vol. 3, 239:13-17.  Ms. Street testified these kits took "hundreds and hundreds" of hours to assemble, *see* Trial Tr. Vol. 4, 13:20-24, and both Ms. Street and Mr. Borden testified to the large number of info kits that were created.  *See id.*; Trial Tr. Vol. 5, 190:16-20.  Additionally, Ms. Street testified these kits were kept secret by storing them on a password protected Sharepoint drive that was accessible to Mr. Borden and other members of the marketing and sales team.  *See* Trial Tr. Vol. 4, 13:25-14:7.

Defendants focus their argument on the temporary publication of some of the info kits to the Arnold's and Sunline websites and distribution to customers, claiming this publication and distribution removed any trade secret protection the info kits might have had.  *See* Trial Tr. Vol. 3, 152-53; Trial Tr. Vol. 4, 14:73-74; Trial Tr. Vol. 5, 190-91.  While such material would lose its trade status once publicly disclosed, *see Heartland Home Fin., Inc.,* 258 F. App'x at 862,  Ms. Street testified, particularly with respect to the publication of the info kits on the website, that only some and not all of the info kits were publicized.

### 3. Customer Lists

While items like customer lists are not automatically protected as trade secrets, "they do constitute trade secrets where the compilation of that information represents a 'material investment of [the] employer's time and money.'" *AmQuip Crane Rental, LLC v. Crane & Rig Servs., LLC*, 199 A.3d 904, 915 (Pa. Super. Ct. 2018) (alteration in original) (quoting *Colteryahn*

*Dairy, Inc. v. Schneider Dairy*, 203 A.2d 469, 473 (Pa. 1964)); *see Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 706 (E.D. Pa. 2014). Customer lists have long received trade secret protection under Pennsylvania law. *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1258 (3d Cir. 1985). However, when an owner makes no such investment and instead obtains the list from a third-party, the list is not a protectable trade secret. *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 13 F. Supp.3d 465, 474-75 (E.D. Pa. 2014).

A customer list composed of information readily available from a third-party source may have trade secret protection if the party invested significant time and capital to compose such a list. *See BIEC Int'l, Inc v. Global Steel Serv., Ltd.*, 791 F. Supp. 489, 545 (E.D. Pa. 1992) (granting trade secret protection to a customer mailing list that contained certain information that was readily ascertainable to someone working in the industry and discoverable by reference to a standard trade journal); *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 519 (E.D. Pa. 2018) (noting that "courts have afforded greater protection to the compilation of [pricing] information—its aggregation and organization into the spreadsheets where the compilation of information is not readily obtainable from publicly available sources").

Defendants argue that customer lists are given protection only when they represent "permanent and exclusive relationships between customers and salesmen. *See Allied Env't Serv., Inc. v. Roth*, 222 A.3d 422, 430 (Pa. Super. 2019). Additionally, Defendants aver that because Plaintiffs directed Borden to use customer lists obtained from trade shows, Steelcase, or Zoominfo, such lists cannot satisfy the permanent and exclusive requirement even when culled. They claim that because competitors had access to the same information through legitimate means, particularly with respect to Zoominfo, these lists do not qualify for trade protection.

At trial, Ms. Street and Mr. Borden testified as to the information contained in the customer lists.  This information included customers' names, titles, order history, company profiles, etc.  *See* Trial Tr. Vol. 4, 7:20-24 (ECF No. 194); Trial Tr. Vol. 5, 40:25-41:9.  Ms. Street also explained for the jury how these lists are curated, particularly with respect to the lists gleaned from third parties.  This process included identifying target markets, products, and specific employees within organizations who had the power to purchase PPE.  *See* Trial Tr. Vol. 3, 226:13-24.  Once this information was curated, Plaintiffs stored this information in a password protected database.  *Id.* at 232:5-9.  This evidence was sufficient to show Plaintiffs' material investment of time and money in creating these lists and that Plaintiffs took substantial steps to keep this information secret from outsiders.  *See AmQuip Crane Rental, LLC*, 199 A.3d at 915; *Shepherd*, 25 A.3d at 1244.

### 4.  Price Lists

Defendants argue the price lists are not trade secrets because they are composed of information that is readily obtainable.  But as discussed above, information gleaned from third parties does not lose trade secret protection if a party invested significant time and capital in developing such a list.  *See BIEC Int'l, Inc*, 791 F. Supp. at 545; *Freedom Med. Inc. v. Whitman*, 343 F. Supp.3d at 519.  And the jury was presented with evidence to this effect, when Robert Pfister, Vice President of Sales, explained the efforts that went into creating these lists.  Trial Tr. Vol. 3, 150:17-151:10 ("The trade secret was developed because of what I testified before, was all the research that we did to get first of all, the factories that sold the products … And the market research we did with all the prices, competitive pricing that was out there.").

Viewing the evidence in the light most favorable to the Plaintiffs a reasonable jury could find the customer lists, price lists, and info kits qualified for trade secret protection.  Moreover,

Defendants have failed to meet their burden of demonstrating "the jury's verdict resulted in a miscarriage of justice or shocks the conscience."  For these reasons and the reasons discussed above Defendants' motion is denied.

## IV.   DEFENDANTS' MOTION FOR A NEW TRIAL

Defendants have also filed a Motion for a New Trial pursuant to Rule 59.  They argue a new trial should be ordered because the damages award and the jury's finding of willful and malicious conduct was not supported by the evidence, and, that the Court committed an error by precluding the Restricted Covenant Agreement from the trial.

### A.   Damages Were Supported by Evidence.

Defendants argue the jury's award of $1,022,016 in actual damages was not supported by the evidence.  While a trial judge may agree or disagree with a jury's verdict, "the verdict must be upheld so long as it is supported by a 'minimum quantity of evidence from which a jury might reasonably [decline to] afford relief.'" *Ansbro v. Nat'l R. R. Passenger Corp.*, No. CIV. A. 90-5042, 1991 WL 258831, at *1 (E.D. Pa. Dec. 3, 1991) (quoting *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 290 (3d Cir.1991)).  A trial judge "must be extremely reluctant to interfere with the time-honored power of the jury, in the exercise of its collective judgment, to assess the damages sustained by the plaintiff." *Billebault v. Dibattiste*, No. 96–cv–6501, 1999 WL 191648, at *8 (E.D.Pa. March 29, 1999) (quoting *Tann v. Servs. Distributors, Inc.*, 56 F.R.D. 593, 598 (E.D.Pa.1972)) (internal quotation marks omitted).

Defendants' argument regarding damages is twofold.  First, they argue the jury awarded $255,504 on each count because they apparently did not understand they were required to calculate the damages for each claim independently.  Next, they argue the evidence does not support the jury's damages award of $1,022,016.  Defendants point to Plaintiffs' claim at trial

that Defendants sold, at most, $1,077,698 to "Arnold's customers, former customers, and prospects," and that Defendants made, at most, up to between 20 and 25% on those sales. *See* ECF No. 211 at 3. Therefore, Defendants contend, the amount of sales compared against the profit margin would not justify the jury's award of $1,022,106 in actual damages.

With respect to Defendants' first argument, the Court is not going to speculate as to what the jury probably or may have intended to award when calculating the damages in this case. Prior to deliberations, the jury was instructed on how to determine the damages upon a finding of liability. And while the jury's damages were identical for each count, the damages amount was supported by the evidence, as discussed below. Therefore we are not going to speculate on how the jury arrived at their damages award. *See New Mkt. Inv. Corp. v. Fireman's Fund Ins. Co.*, 774 F. Supp. 909, 917 (E.D. Pa. 1991) ("The mere fact that neither the plaintiff nor the Court has been able to mathematically deduce how the jury arrived a[t] such a figure does not mandate that the jury's verdict should be overturned or a new trial awarded by this Court.").

Defendants next argue the jury's award of damages in the amount of $1,022,016 was against the weight of the evidence and cannot be reconciled with the instructions provided by the court as to the damages on all four counts. Defendants focus on the amount of sales to "Arnold's customers, former customers, and prospects." *See* ECF No. 211 at 3. But the jury was presented with evidence from Borden and Jordan Berkowitz that IMBG made over three million dollars worth of sales from its inception through October of 2021. *See* Trial Tr. Vol. 6, 24:9-23, 107:19-23. Jordan Berkowitz also testified that approximately 2.7 million out of the three million in sales was made from Arnold's customers. Trial Tr. Vol. 6, 107:19-23 (ECF No. 196). He also stated that for the period of September 2020 through September 2021, the company's profit margin on PPE was 39.05%, which he stated was a conservative estimate. *Id.* at 108:4 - 109:5,

13

110:1-5.  Finally, Jordan Berkowitz testified that had IMBG's business been run through

Arnold's, with the profit margin of 39.05% they would have expected a profit of roughly $1.185

million dollars.  *Id.* at 113:22-25.  Accordingly, we find there was a "minimum quantity of

evidence" for the jury to assess damages in the amount of $1,022,016.  *Ansbro,* 1991 WL

258831, at *1.

> **B.**    **The Decision to Preclude the Restricted Covenant Agreement from the First
> Phase of the Trial Was Not Error.**

Defendants argue that our decision to preclude any mention of a Restricted Covenant

Agreement ("RCA") between Borden and the Plaintiffs was made in error.  When evaluating a

motion for a new trial on the basis of trial error, the Court's inquiry is twofold.  *Est. of*

*Lieberman v. Playa Dulce Via, S.A.*, No. CV 14-3393, 2022 WL 2945247, at *4 (E.D. Pa. July

26, 2022).  We must first determine whether an error was made, and then "whether that error was

so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice."

*Farra v. Stanley–Bostitch, Inc.*, 838 F. Supp. 1021, 1026 (E.D. Pa. 1993); *see id.*  The Court has

"wide latitude" to grant or deny a new trial on this basis.  *Pierce v. City of Philadelphia*, 391 F.

Supp. 3d 419, 432 (E.D. Pa. 2019), *aff'd*, 811 F. App'x 142 (3d Cir. 2020) (internal citation

omitted).

Prior to the trial, Plaintiffs moved to preclude the RCA through a Motion in Limine,

arguing that evidence concerning the RCA was irrelevant and would confuse the issues and

mislead the jury.  *See* ECF No. 130.  Plaintiffs argued that because their Amended Complaint

removed any claims related to an RCA, Defendants should not be permitted to reference the

original complaint and the RCA, which were no longer part of this case.  *See id.*  Defendants

argued the original complaint which contained information relevant to the RCA should be

admissible, as it was relevant to Defendants' Wage Payment and Collection Law ("WPCL")

claim as well as Defendants' affirmative "unclean hands" defense to Plaintiffs breach of fiduciary duty claim.  *See* ECF No. 146.  Defendants also contended the RCA was relevant for the purpose of assessing Plaintiffs' credibility, the issue of whether Plaintiffs' refusal to pay Borden was made in good faith, and to Defendants' claim for punitive damages.  *See id.*

On May 3, 2022, we notified the parties of our intent to bifurcate the trial.  *See* ECF No. 156.  The first phase would focus on liability for each of the claims and counterclaims.  *See id*. If Defendants were to prevail on the trade secrets misappropriation claim, or if they prevailed on the WPCL claim, the trial would proceed to a second phase, where the jury would decide whether Plaintiffs brought their trade secrets claims in bad faith, and/or whether a good-faith dispute justified Plaintiffs' alleged non-payment of wages.  *See id.*  In our Motion in Limine decision dated May 12, 2022, we found the RCA and the circumstances surrounding its formation was relevant only to the issue of Plaintiffs' alleged "bad faith."  *See* ECF No. 165.  As such, evidence concerning the RCA would be precluded from the first phase of trial, as it posed a substantial risk of confusing the issues for the jury.  *See id.*  Such evidence would, however, be admissible during the second phase of the trial.  *See id.*  We also noted that the defense of "unclean hands" was not applicable to Plaintiffs' claim for breach of fiduciary duty once Plaintiffs represented they no longer sought to enjoin Defendants' conduct.

The Court did not err in precluding evidence regarding the RCA from the first phase of the trial, nor can Defendants show how this pre-trial ruling led to an outcome inconsistent with substantial injustice.  *See Farra*, 838 F. Supp. at 1026.  They claim that had Defendants been permitted to present evidence regarding the RCA, the jury may not have found that Mr. Borden violated his fiduciary duties, let alone willfully or maliciously.  But as we stated in our Motion in Limine order, Defendants' unclean hands defense was inapplicable once Plaintiffs represented

they only sought money damages and not to enjoin Defendants' conduct. *See* ECF No. 164. Therefore, the RCA was precluded from the first phase of the trial. Had the case proceeded to the second phase, such evidence may have been admissible.

### C.     The Jury's Finding of Willful and Malicious Conduct Was Supported by the Evidence.

Defendants next argue the evidence presented at trial does not support a finding of willful and malicious conduct. Here, Defendants make the same arguments they made in their response to Plaintiff's Motion for Exemplary Damages. *See* ECF No. 200. Their arguments focus on Borden's belief, perhaps mistaken, that he was not taking customers away from Arnold's, and that he was selling inventory that Arnold's could not or would not sell. Defendants also point to the relatively small sales Borden made compared to Plaintiffs' sales which were on a much larger scale, which is evidence that Borden was not trying to cause Plaintiffs any injury. And Defendants again point Borden's continued sourcing and selling of inventory after August 5, 2020 and how such evidence can best be described as a "misunderstanding as to whether Mr. Borden could finish the deals he had in the pipeline, or whether he was limited to the deliveries in his pipeline." *See* ECF No. 211 at 6.

Addressing these same arguments previously, we found the jury's determination that Defendants acted willfully and maliciously was soundly rooted in the evidence admitted at trial. *See* ECF No. 206. Defendants here have not presented any new arguments as to why the jury's finding of willful and malicious conduct should be disturbed. For this reason, and the reasons explained above, Defendants' motion is denied.

## V.     MOTION TO EXTEND DEADLINE FOR FILING OF MOTION FOR ATTORNEYS' FEES.

Plaintiffs filed a Motion to Mold Judgment to Include An Award of Attorneys' Fees and Expenses on September 9, 2022, 15 days after the Court entered judgment in this matter. *See*

ECF No. 209.  Defendants filed a response on September 22, 2022, arguing, *inter alia*, that Plaintiffs' motion was untimely.  *See* ECF No. 209.  Upon discovering their error, Plaintiffs filed the instant motion on September 26, 2022, requesting an extension *nunc pro tunc* to file their Motion for Attorneys' Fees and Expenses.  *See* ECF No. 213.  Defendants oppose this motion. *See* ECF No. 216.

Under the Federal Rules of Civil Procedure, the Court has discretion to permit, with good cause, an extension of time when a party files a Rule 54 motion after the time has expired if the party failed to act because of excusable neglect.  Fed. R. Civ. P. 6.  However, the Court only has discretion to grant a post-deadline extension motion when the party files a motion and makes a showing of excusable neglect.  *Drippe v. Tobelinski*, 604 F.3d 778, 785 (3d Cir. 2010).  "Thus a party must make a formal motion for extension of time and the district court must make a finding of excusable neglect, under the *Pioneer* factors, before permitting an untimely motion."  *Id.* at 785 (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 395 (1993)).

### A.        Plaintiffs have demonstrated excusable neglect.

In *Pioneer*, the Supreme Court set out the parameters for an excusable neglect inquiry. 507 U.S. at 395.  When considering a motion to extend a filing deadline, a court must consider "all relevant circumstances surrounding the party's omission. These include ... the danger of prejudice ..., the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith."  *Id.* at 395.  The Third Circuit has held that the *Pioneer* factors are applicable to all excusable neglect inquiries conducted pursuant to the Federal Rules of Civil Procedure.  *In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 125 n. 7 (3d Cir.1999).  A court conducting such an inquiry must consider all of the *Pioneer* factors in making its determination.

*See In re Am. Classic Voyages Co.*, 405 F.3d 127, 133 (3d Cir. 2005) ("All factors must be considered and balanced; no one factor trumps the others.").  Plaintiffs contend the delay in filing their Rule 54 motion was the result of excusable neglect and have requested an extension *nunc pro tunc*.  Defendants oppose the motion, focusing primarily on the third *Pioneer* factor – whether the delay was within the reasonable control of the movant.  The Court will address each factor in turn.

### 1.  Danger of Unfair Prejudice

Plaintiffs argue there is low risk of prejudice to the Defendants, as the one-day delay should not have surprised Defendants and they were on notice that Plaintiffs would be filing a motion for attorneys' fees.  Plaintiffs point to the pre-trial memoranda filed by both parties wherein they both indicated they would be seeking attorneys' fees.  Defendants argue that Defendant's knowledge of a potential motion for fees does not excuse the untimely filing.

"A non-movant suffers prejudice if the passage of time hinders its ability to support its position, such as from the 'loss of available evidence, increased potential for fraud or collusion, or substantial reliance upon the judgment.'" *Fuhrer v. Hartford Life & Accident Ins. Co.*, No. 2:21-CV-05040-JDW, 2022 WL 970848, at *2 (E.D. Pa. Mar. 31, 2022) (quoting *Hill v. Williamsport Police Dep't*, 69 F. App'x 49, 52 (3d Cir. 2003)).  "One purpose of the fourteen-day deadline in Rule 54(d)(2)(B) is to provide notice to the opposing party of the claim for attorneys' fees before the time to appeal has lapsed." *Franlogic Scout Dev., LLC v. Scott Holdings, Inc.*, No. CV 16-5042, 2018 WL 2002203, at *3 (E.D. Pa. Apr. 30, 2018) (internal citations omitted). Defendants claim they will be prejudiced by the motion because they were not on notice as to the amount of attorney's fees Plaintiffs would seek prior to Plaintiffs' Rule 54 motion, only that they intended to file a motion requesting fees.  Defendants cite two cases from this District where the

Court denied untimely fee petition motions when the non-moving party was on notice the moving party intended to file such a motion. *See Levin v. American Honda Motor Corp., Inc.*, Civ. A. No. 94-5380, 1996 WL 195383 (E.D. Pa. Apr. 19, 1996); *Rui Tong v. Henderson Kitchen, Inc.*, Civ. A. No. 17-1073, 2020 WL 5211237 (E.D. Pa. Sept. 1, 2020). However, the delay in filing the motion for attorneys' fees on both of these cases was significantly greater than the delay in this case. *See Levin*, 1996 WL 195383 at *1-2 (fee petition filed five months after entry of judgment); *Rui Tong*, 2020 WL 5211237 at *6 (motion for attorney's fees filed more than three months after Rule 54 deadline).

Here, Plaintiffs filed their Rule 54 motion one day late. Upon discovery of their error, they then filed a Motion to Extend the Deadline for the Filing of their Motion for Attorneys' Fees. While Defendants argue they will be prejudiced by the untimely notice, especially considering the amount of attorneys' fees that are requested, the Court finds this factor weighs in favor of Plaintiffs, as their delay was "de minimus." *New Jersey Payphone Ass'n, Inc. v. Town of W. New York*, 155 F. Supp.2d 122, 125 (D.N.J. 2001).

### 2. Length of the Delay and its Potential Impact on Judicial Proceedings

Plaintiffs claim the length of delay was minimal and Defendants did not address this factor in their response. For the same reasoning explained above with respect to the first *Pioneer* factor, this factor weighs in favor of Plaintiffs.

### 3. The Reason for the Delay

In *Pioneer*, the Supreme Court noted that "inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect." 507 U.S. at 392. In an excusable neglect inquiry, the Court may rely primarily on this third *Pioneer* factor, especially "[where] the delay in th[e] case was entirely avoidable and within [the movant's] control." *In re*

19

*Kaplan*, 482 F. App'x 704, 707 (3d Cir.2012) (quoting *In re Am. Classic Voyages Co.*, 405 F.3d at 133–134).  Defendants argue the error of Plaintiffs' counsel was avoidable and entirely within their control.  They state that a simple review of the Court's entry of judgment would have alerted Plaintiffs' counsel to the correct deadline for filing their Rule 54 motion.  They then cite several cases from various jurisdictions wherein Courts found similar calendaring errors did not constitute excusable neglect.  For their part, Plaintiffs' counsel admits that the error was within their control, and that they were responsible for the "circling" of the calendar.  The Court therefore concludes this factor weighs against granting Plaintiffs' motion.

### 4.  Whether the Movant Acted in Good Faith

"[A] party acts in good faith when he acts with 'reasonable haste to investigate the problem and to take available steps toward a remedy.'"  *In re Smiles*, 600 F. App'x 838, 841 (3d Cir. 2015) (quoting *In re Cendant Corp. PRIDES Litig.*, 235 F.3d 176, 184 (3d Cir. 2000)).  Here, Plaintiffs filed their Motion for Attorneys' Fees one day late.  Plaintiffs' counsel represents they did not realize their error until Defendants filed their response and argued the motion was untimely.  Upon their realization, Plaintiffs filed the instant motion for an extension *nunc pro tunc*.  Because they acted quickly to take this "available step towards a remedy," this factor weighs in favor of Plaintiffs. *See id.*; *Fuhrer*, 2022 WL 970848, at *2 ("The negligent nature of the error here, and the haste with which [plaintiff] sought to remedy the problem, demonstrate her good faith.").

Upon weighing the *Pioneer* factors, the Court finds that Plaintiffs' delay in filing their motion is attributable to excusable neglect.  While Plaintiffs' error was avoidable and within their control, the Court finds this factor does not tip the scales so heavily as to outweigh the other three *Pioneer* factors.  Accordingly, Plaintiffs' motion is granted.

## VI.      MOTION TO MOLD VERDICT FOR ATTORNEYS' FEES

The DTSA and the PUTSA[1] permit an award of reasonable attorney's fees to the

prevailing party if a trade secret was "willfully" and "maliciously" misappropriated.  18

U.S.C. §§ 1836(b)(3)(C)–(D) (providing that a court may award fees … if "the trade secret

was willfully and maliciously misappropriated"); 12 Pa. Stat. and Cons. Stat. Ann. § 5305

(providing that a court may award fees where "willful and malicious appropriation exists").

This decision lies solely within the Court's sound discretion.  *See Estate of Accurso v. Infra-*

*Red Servs., Inc.*, 805 F. App'x 95, 107 (3d Cir. 2020) ("The plain language of the [PUTSA]

makes it clear that that the award of attorneys' fees … is not mandatory."); *Elmagin*

*Cap., LLC v. Chen*, No. 20-2576, 2022 WL 2192932, at *1 (E.D. Pa. June 17, 2022).

Just because a jury finds willful and malicious misappropriation does not necessarily mean

that the prevailing party is entitled to attorney's fees.  *Estate of Accurso*, 805 F. App'x at

107.

### A.      Attorneys' Fees are not Warranted.

We previously addressed a similar issue when Plaintiffs filed a motion requesting

exemplary damages based on the jury's finding of willful and malicious conduct.  *See* ECF

No. 182.  In an opinion dated August 23, 2022, we found that exemplary damages would be

inappropriate.  *See* ECF No. 207.  Much of the evidence presented at trial focused on an

agreement between the parties in August 2020 following Plaintiffs' discovery of

Defendants' competing enterprise. Evidence was presented that following this agreement,

---

[1] The PUTSA defines "willful and malicious" as "[s]uch intentional acts or gross neglect of duty as to evince a reckless indifference of the rights of others on the part of the wrongdoer, and an entire want of care so as to raise the presumption that the person at fault is conscious of the consequences of his carelessness."  12 PA. CONS. STAT. ANN. § 5302.

Borden believed he had permission to finalize deliveries *as well as* "deals that were yet to be closed in the pipeline."  Trial Tr. Vol. 5, 100:14–20. And we found there was no direct evidence to show that his continued sourcing and selling of inventory through IMBG after August 2020 was intended to affirmatively harm Plaintiffs.  Borden's motivation, admittedly, was greed.  *See id.* at 60:24–61:1 ("I was in the moment.  I was trying to make money, I was trying to do what was best for my family, and I took advantage, I grabbed it.").

We did note, however, that Borden was well aware of his wrongdoing, especially when he was repeatedly warned by Plaintiffs' President Jordan Berkowitz and Plaintiffs' Senior Vice President Robert Pfister that IMBG represented a conflict of interest.  *See, e.g.*, Trial Tr. Vol. 3, 83:9–16; Pls.' Ex. 89; Pls.' Ex. 189; Pls.' Ex. 190.  Additionally, Borden understood Berkowitz's aversion to IMBG.  *See* Trial Tr. Vol. 5, 86:3–5.  Upon a review of the record and the jury's finding of willful and malicious conduct, we found that on balance, the amount the jury awarded to Plaintiffs sufficiently deterred future misconduct and reflected the Defendants' culpability, and therefore exemplary damages were not appropriate.

We now reach a similar conclusion.  Plaintiffs request attorney's fees based on the jury's finding that Defendants' conduct was willful and malicious.  But Plaintiffs have not proven that an award of attorneys' fees is warranted.  Similar to their prior motion for exemplary damages, their current motion appears to be rooted primarily in the jury's determination that Defendants acted willfully and maliciously.  *See* ECF No. 183-1 at 4. However, as we noted in our prior opinion, that finding does not, in and of itself, justify an award of attorney fees.  *Estate of Accurso*, 805 F. App'x at 107.

Plaintiffs argue courts have awarded attorneys' fees upon a finding of willful and malicious conduct, and cite two cases where courts awarded fees that were lower than the fees requested by Plaintiffs in this case - *Mifflinburg Telegraph, Inc. v. Criswell*, 277 F.Supp.3d 750 (E.D. Pa. 2017) and *B & B Microscopes v. Armogida*, 532 F.Supp.2d 744 (W.D. Pa. 2007).  However, those cases are distinguishable.  In *Mifflinburg Telegraph*, Plaintiffs were awarded attorney's fees under the PUTSA where the defendant, while negotiating a buyout of plaintiff's company over the course of several months, was at the same time organizing her own business.  277 F.Supp.3d at 807.  Additionally, the defendant stole plaintiff's computer list, misappropriated the company's forms, and deleted their computer files, which negatively impacted their operation.  *Id.*  In *B & B Microscopes*, the defendant was given access to a software system owned by his employer that was treated as a trade secret.  532 F.Supp.2d at 756.  After the defendant resigned from the company he took the software system with him and began competing against his former employer.  *Id.* He deleted references to the system on his computer, overwrote the data and refused to provide a copy of the software to the plaintiff following his resignation, thus denying plaintiff their trade secret.  *Id.*  He then took the ultimate step of marketing the product as his own property.  *Id.*  The facts of both of these cases show affirmative steps that were taken to inflict harm on the victimized parties.  Here, while the jury found Defendants' conduct was willful and malicious, it did not rise to the level of actions taken by the defendants in *Mifflinburg Telegraph and B & B Microscopes*.

While the jury concluded that Defendants' conduct was willful and malicious, that does not automatically warrant an award of attorneys' fees.  Instead, the decision to award attorneys' fees ultimately rests within the Court's discretion.  Upon review of the record, the Court declines

Plaintiffs' request for attorneys' fees.  Plaintiffs' Motion is therefore denied, and an appropriate Order follows.

## VII.   CONCLUSION

Based on the foregoing, Defendants' Motion for Renewed Judgment as a Matter of Law Or, in the Alternative, a New Trial, Defendants' Motion for a New Trial, and Plaintiffs' Motion to Mold Judgment to Include an Award of Attorneys' Fees and Expenses are **DENIED**. Plaintiffs' Motion to Extend Deadline for Filing of Motion for Attorneys' Fees is **GRANTED**. An appropriate Order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge